1

2

3

4

5

6

7                 UNITED STATES DISTRICT COURT

8            FOR THE EASTERN DISTRICT OF CALIFORNIA

9
CHRISTINE M. HAGAN as
10 Personal Representative
and as GUARDIAN Ad LITEM
11 for CONNOR HAGAN, a minor,

12                                 NO. CIV. S-07-1095 LKK/DAD
          Plaintiffs,
13
     v.                                   O R D E R
14
CALIFORNIA FORENSIC
15 MEDICAL GROUP, et al.,

16
          Defendants.
17 _____/

18      This case centers on the death of Michael Hagan, whose death

19 resulted from complications relating to severe asthma shortly after

20 being transferred from Butte County Jail to High Desert State

21 Prison.  Plaintiffs, widow and the child of decedent, bring claims

22 under 42 U.S.C. § 1983 and state law alleging that decedent

23 received inadequate medical care.  Defendants are County of Butte,

24 California Forensic Medical Group ("CFMG"), the California

25 Department of Corrections and Rehabilitation ("CDCR") (dismissed),

26 and seven medical staff employed by CDCR.

Before the court is defendant County of Butte's motion for summary judgment on all claims against it. For the reasons stated below, the court grants this motion.

## I. BACKGROUND[1]

On August 26, 2005, decedent Michael Hagan was arrested and placed in custody in the Butte County Jail. He was released on bail on September 30, 2005, and subsequently remanded without bail on February 8, 2006. On that date he also pled guilty to the offenses with which he was charged. (County's Req. for Judicial Notice Supp. Mot. Summ. J., Ex. B). He remained in the custody at the Butte County Jail until May 11, 2006, when he was transferred to High Desert State Prison ("HDSP"). The next day he suffered severe respiratory distress. HDSP employees called for a "life-flight," and flew him to a hospital in Reno, Nevada. He remained at the hospital until he was pronounced dead on May 16, 2006.

At the time of his arrest, decedent suffered medical conditions giving rise to particular medical needs. Most significantly, he suffered from a serious form of asthma. Health

---

[1] The following facts drawn from the parties' statement of undisputed facts unless otherwise indicated, interpreted pursuant to the standards discussed in the text. As discussed in a separate order, the majority of the evidence submitted by plaintiff in opposition to this motion must be struck from the record. That evidence is not considered here.

In opposing this motion, plaintiffs repeatedly argue that defendant has not provided evidence that contradicts plaintiffs' allegations. This argument misunderstands the standard for summary judgment. Under Celotex, where, as here, the nonmoving party would bear the burden of proof at trial, summary judgment is proper if the nonmoving party has failed to provide any evidence on a dispositive issue.

care providers at Butte County Jail described decedent "as having a steroid dependent asthma condition" and as "a Prednisone dependent asthmatic" (Whitefleet Decl. Ex. A 4, 6), and plaintiffs describe decedent as "status asthmaticus." Decedent also complained of mental health problems. Plaintiffs state that he had sought treatment at a county-run behavioral health clinic prior to his arrest, and that he was bi-polar. (Hagan Decl.)

The Butte County Jail is operated by the Butte County Sheriff's Office ("BCSO"). BCSO does not directly provide medical care to inmates. Instead, the County contracts with defendant California Forensic Medical Group ("CFMG"), a private company, to administer medical care and medication in the jail. Under this contract, the County does not closely supervise CMFG's administration of care. County jail officers nonetheless play several roles in inmates' access to care.

Under BCSO policies, inmates access care by communicating with BCSO officers. Officers are required to conduct regular direct and visual security checks of inmates, and the custom is for officers to check each inmate hourly.[2] During these checks, inmates can request a "sick slip," through which the inmate will request to be seen in the infirmary. These slips are collected at the end of every day. Additionally, if an inmate experiences a medical emergency, the officer is to notify the medical unit, which will determine how to respond. Officers are themselves instructed in

---

[2] Plaintiff disputes whether these checks actually occur hourly, but has provided no evidence to the contrary.

and expected to deliver CPR and first aid.  If an inmate believes that he was not provided proper care, he can file a grievance through jail procedures.

Plaintiffs agree that the above were the official policies of CFMG and the BCSO.  They contend, however, that BCSO officers generally did not comply with them, such that decedent was denied access to medical care.  Decedent apparently had mixed success in accessing care at Butte County Jail.  On three occasions (2/23/06, 3/6/06, 4/15/06), decedent submitted a sick slip and was seen within two days.  On three other occasions the state court overseeing decedent's criminal case ordered the jail to provide decedent with his medications and access to medical attention within twenty-four hours.  (County's RJN Ex. C, D, E (orders of 9/6/05, 9/19/05, and 3/8/06)).  Neither these orders nor anything else in the record provide an indication as to whether the state court issued these orders because decedent was having trouble being seen, because he was being seen but the care he was receiving was inadequate, as a prophylactic, or for some other reason.  Beyond these state court orders, the only admissible evidence indicating that decedent was ever denied care is that according to plaintiffs' expert Stephan Pardi, jail records indicate that decedent complained he had not received his prednisone in the two days prior to his transfer.

Decedent received some treatment for his asthma while at Butte County Jail.  He was permitted to keep an albuterol "rescue" inhaler on his person at all times.  He was also prescribed

prednisone, the steroid he was taking prior to entering custody. The dosage prescribed to decedent varied. When he entered custody on February 8, 2006, he was prescribed 20 mg of prednisone daily. (Whitefleet Decl. Supp. Mot. Summ. J. Ex. A (Def. CFMG's responses to Plaintiff's Interrogatories).) On several occasions, this dosage was increased, only to be tapered down again. The record indicates only two days for which decedent was not prescribed prednisone, on or about April 16, 2006, occurring at the end of a long taper in decedent's dosage.

On May 11, 2006, at 5:40 a.m., decedent was transferred to High Desert State Prison. There was no evaluation of decedent's health immediately prior to this transfer. On May 12, while at HDSP, decedent suffered an acute asthma attack. (Suppl. Decl. of Christina Hagan, Ex. 1, 2, Whitefleet Decl. Ex. B, 2.) After unsuccessful attempts by CDCR staff to intubate decedent to administer oxygen, the CDCR medical staff administered cardiopulmonary resuscitation. Decedent was transported to St. Mary's Regional Medical Center in Reno, Nevada, where he was pronounced dead on May 16 at 5:45 p.m.

Plaintiffs filed a government tort claim with the County of Butte on November 21, 2006. The County rejected this claim as being filed more than six months after plaintiffs' cause of action accrued, and therefore untimely. Plaintiffs then petitioned the County for leave to file a late claim, but this petition was denied. Plaintiffs filed this suit on June 7, 2007.

////

**II. STANDARD FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Poller v. Columbia Broadcast System</u>, 368 U.S. 464, 467 (1962); <u>Jung v. FMC Corp.</u>, 755 F.2d 708, 710 (9th Cir. 1985); <u>Loehr v. Ventura County Community College Dist.</u>, 743 F.2d 1310, 1313 (9th Cir. 1984).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id</u>. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Id</u>. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders

all other facts immaterial." _Id_. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." _Id_. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. _Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 586 (1986); _First Nat'l Bank of Arizona v. Cities Serv. Co._, 391 U.S. 253, 288-89 (1968); _Ruffin v. County of Los Angeles_, 607 F.2d 1276, 1280 (9th Cir. 1979), _cert. denied_, 455 U.S. 951 (1980).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); _Matsushita_, 475 U.S. at 586 n.11; _First Nat'l Bank_, 391 U.S. at 289; _Strong v. France_, 474 F.2d 747, 749 (9th Cir. 1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248 (1986); _T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n_, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, _Anderson_, 242 U.S. 248-49; _Wool v. Tandem Computers, Inc._, 818 F.2d 1433, 1436

(9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.

Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

## III. ANALYSIS

### A.   Plaintiffs' Section 1983 Claim

Plaintiffs bring a claim against the County under 42 U.S.C. section 1983, which provides a cause of action for individuals deprived of a federal right by persons acting under color of state law.   Plaintiffs' complaint alleges that decedent received constitutionally inadequate medical care.

Although this claim is seemingly straightforward, it presents significant challenges for this court.   In opposing the present motion for summary judgment, plaintiffs identify a wide range of conduct which they contend violated decedent's Eighth Amendment rights.   Plaintiffs' filings, however, do not demonstrate recognition of the fact these contentions amount to different theories of the case and must be treated as such.   Similarly, plaintiffs' arguments implicate, without discussion, several types of municipal liability. The resulting conflation of various theories, coupled with the discovery and evidentiary problems discussed in this court's separate order, have complicated

evaluation of plaintiffs' claims.

The court attempts below to disentangle plaintiffs' separate theories. I begin by reviewing the standards for an Eighth Amendment medical care claim and the relevant types of municipal liability under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). After laying this foundation, I evaluate whether, under each of plaintiffs' claimed inadequacies of care, plaintiffs have provided evidence to support any type of municipal liability.

## 1. Eighth Amendment Requirements for Medical Care

Plaintiffs' section 1983 claim against the County implicates decedent's rights under the Eighth and Fourteenth Amendments, corresponding with his time as a pre- and post-conviction inmate, respectively.[3] City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). Although "the protections provided pretrial detainees by the Fourteenth Amendment [may] in some instances exceed those provided convicted prisoners by the Eighth Amendment," plaintiff has not argued that this is the case here. Gibson v. County of Washoe, 290 F.3d 1175, 1188 (9th Cir. 2002). Therefore, all of plaintiffs' claims may be analyzed under the Eighth Amendment framework.

Under the Eighth Amendment, "a person is liable for denying a prisoner needed medical care only if the person 'knows of and

---

[3] Plaintiffs' section 1983 claim rests on the constitutional rights of decedent, rather than the rights of plaintiffs. Plaintiffs claim that they have been harmed by the loss of decedent, but not that this loss deprived them of their own constitutional rights.

disregards an excessive risk to inmate health and safety.'" Gibson, 290 F.3d at 1187-1188 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). This amounts to a requirement of "deliberate indifference," and requires subjective knowledge of the risk on the part of the defendant. Id. at 1187. Medical malpractice does not itself constitute the deliberate indifference that gives rise to a constitutional violation. Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980), Wilson v. Terhune, 2008 U.S. Dist. LEXIS 96746 (E.D. Cal. Nov. 20, 2008). Plaintiffs' particular theories of the ways in which decedent was exposed to excessive risks are discussed below.

### 2.   Types of Municipal Liability under Monell

Pursuant to the Supreme Court's decision in Monell, county and municipal entities are "persons" for purposes of section 1983. Monell, 436 U.S. at 690. Municipal entities, however, cannot be subjected to liability under section 1983 on a respondeat superior theory. Id. at 691. Instead, courts have identified a number of other types of municipal liability, two of which are relevant here.[4] First, a municipal entity may be liable when an individual or body's exercise of policymaking authority directly deprived a plaintiff of his constitutional rights. Id. at 694, City of St.

_____

[4] The Ninth Circuit has adopted numerous categorizations and enumerations of the various types of Monell liability. For three cases providing three different categorizations, see Price v. Sery, 513 F.3d 962, 966 (9th Cir. 2008), Gibson, 290 F.3d at 1185, and Fuller v. City of Oakland, 47 F.3d 1522, 1534 (9th Cir. 1995). Although applying different terminology, each of these cases recognizes the types of liability discussed here.

Louis v. Praprotnik, 485 U.S. 112, 124 (1988) (plurality), Pembaur v. Cincinnati, 475 U.S. 469, 480-81 (1986)), Gibson, 290 F.3d at 1187-93, Christie v. Iopa, 176 F.3d 1231, 1235-38 (9th Cir. 1999). Second, a municipal entity may be liable for the acts of an non-policymaking employee if these acts resulted from a policy, practice or custom expressing the entity's deliberate indifference to a constitutional right, even if the policy itself is constitutional. City of Canton v. Harris, 489 U.S. 378, 387 (1989), Dietrich v. John Ascuaga's Nugget, 548 F.3d 892, 900 (9th Cir. 2008) (quoting Van Ort v. Estate of Stanewich, 92 F.3d 831, 835 (9th Cir. 1996)), Gibson, 290 F.3d at 1194-96. In this case, most of plaintiffs' arguments implicitly fall under the second theory, although several may also be construed as arguing for the first.

### i. Municipal Liability for A Policy That Causes A Constitutional Violation

To bring a claim under the second type of Monell liability, plaintiffs must satisfy four elements: "(1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." Dietrich, 548 F.3d at 900 (quoting Van Ort, 92 F.3d at 835).

A "policy" can be an explicitly adopted policy, or a "longstanding practice or custom" which is "so 'persistent and

widespread' that it constitutes 'permanent and well-settled policy.'" Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (quoting Monell, 436 U.S. at 691, Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir. 1992)).

For purposes of Monell liability, a plaintiff may show the County's deliberate indifference in two ways. Gibson, 290 F.3d at 1185. Plaintiffs may show that the policy satisfies the Farmer test: that the County knew of, and disregarded, an excessive risk of medical harm. More frequently, plaintiffs will show deliberate indifference by showing that the constitutional violation was "a known or obvious consequence" of the County's policy, which the County disregarded. Id. at 1194 (quoting Bd. of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 410 (1997)), City of Canton v. Harris, 489 U.S. 378, 390 (1989). Where, as here, plaintiffs argue that a county policy caused a constitutional violation on the part of a non-policymaking employee, plaintiffs must show two parties' deliberate indifference, indifference on the part of the individual employee, and on the part of the county.

### ii. Municipal Liability for A Policy That Is Itself Unconstitutional

A municipal entity may also be liable if a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" itself violates a constitutional right. City of St. Loius v. Prapotnik, 485 U.S. 112, 121 (1988) (quoting Monell, 436 U.S. at 690). Identifying whether a government entity has provided constitutionally

13

inadequate medical care presents a challenge.  In <u>Farmer</u>, after
adopting the subjective knowledge test for Eighth Amendment medical
care claims, the Supreme Court noted that "considerable conceptual
difficulty would attend any search for the subjective state of mind
of a governmental entity, as distinct from that of a governmental
official."  <u>Farmer</u>, 511 U.S. at 841.  The Ninth Circuit has
interpreted this language to mean that subjective knowledge might
not be required in a claim that a government entity directly
violated the Eighth Amendment.  <u>Gibson</u>, 290 F.3d at 1188 n.9 ("[W]e
do not address whether it is necessary to prove the subjective
Farmer state of mind in suits against entities rather than
individuals."), <u>id.</u> at 1198 (Reinhardt, concurring) ("Although
[<u>Farmer</u>] establishes a subjective test for . . . individual
defendants, in that case the Supreme Court made it reasonably clear
that the same standard does not apply in actions against government
entities involving the adoption of affirmative government
policies.").  The majority did not discusses what alternate
standard might apply, although Judge Reinhardt suggested the
separate deliberate indifference standard from <u>Canton</u>, which looks
to objective obviousness.

### iii. Effect of The Relationship between The County and CFMG on Municipal Liability

County argues that it can only be liable if a constitutional
violation was committed by a County employee.  (Def.'s Mot. Summ.
J. 11.)  Thus, the County implies that medical indifference on the
part of the CFMG contractors cannot support liability on behalf o

the County.

Such a limitation is not warranted. CFMG employees have assumed a public function in providing medical care to inmates on behalf of the County. In performing this function, they are state actors whose conduct is limited by the Eighth Amendment. <u>Sutton v. Providence St. Joseph Med. Ctr.</u>, 192 F.3d 826, 835-836 (9th Cir. 1999). As such, if CFMG employees commit a constitutional violation, and the moving force behind this violation was a County policy manifesting deliberate indifference to constitutional rights, then the County may be liable. The facts that CFMG employees are not directly employed by the county, or that "[n]either BCSO or the jail administration have any supervisorial authority over CFMG," (UMF 10) are relevant only insofar as they speak to these elements.[5]

**3.    Plaintiffs' Specific Theories of Constitutional Violations**

**i.    Interference with Access to Care**

Plaintiffs contend that CFMG employees refused to provide decedent with the prednisone that he had been prescribed, that corrections officers prevented him from accessing care (e.g., by withholding sick slips), and that CFMG employees ignored his requests for mental health care. The only admissible evidence supporting any of these claims are the three state court orders

---

[5] Similarly, the County would not be able to limit its liability by delegating policymaking authority to CFMG. <u>See</u> <u>Lytle v. Carl</u>, 382 F.3d 978, 982-84 (9th Cir. 2004). Neither party argues that such a delegation has occurred here.

1  requiring that decedent receive care, and the jail records
2  indicating that decedent complained that he had not received
3  prednisone for the two days prior to transport.

4       Even if this evidence might enable a jury to conclude that
5  decedent suffered a deprivation of his Eighth Amendment rights, it
6  does not meet plaintiff's burden with regard to any type of Monell
7  liability. Plaintiffs do not (and can not) argue that this
8  potential deprivation was performed by an official policy or
9  policymaking individual (i.e., the first type of municipal
10 liability). Nor have plaintiffs shown that this deprivation was
11 caused by a policy manifesting deliberate indifference. First,
12 plaintiffs have not provided admissible evidence sufficient to
13 establish an unofficial practice or custom of interfering with
14 prisoners' access to care or medications. The Ninth Circuit has
15 found a similarly sparse record "far short of establishing a
16 'persistent and widespread' practice such that it constitutes
17 'permanent and well settled'" policy. Trevino, 99 F.3d at 919
18 (summary judgment for defendant appropriate on issue of whether
19 there was a policy of automatic indemnification when the record is
20 "virtually devoid" of direct evidence of such a policy, and
21 indirect evidence tended to indicate the absence of such a
22 policy).[6] Second, as to the policies for which there is evidence--

23
       [6] Plaintiff's counsel avers that:
24
              I personally experienced the jail's policy to
25            disregard the orders of judges directing the
              jail or the medical staff there to provide
26            medical treatment, medical administration or

                              16

the jail's official policies and the decision to contract with CFMG

for care--no evidence indicates that these policies were the moving

force behind any interference with access to care. Bryan County,

520 U.S. at 404. The County is therefore entitled to summary

judgment as to this theory.

### ii.   Decedent's Treatment During Transport to HDSP

Plaintiffs also base a claim on decedent's treatment prior to

and during transport to HDSP. As with all of plaintiffs' claims,

it is unclear what the subject matter of this claim is. Plaintiffs

state that the "gravamen of the complaint . . . [is] the failure

to examine, recognize and deal with [decedent's] increasingly acute

respiratory distress immediately prior to and during transport."

Opp'n, 8 (emphasis omitted). Plaintiffs also state that

"decedent's health and safety was further jeopardized by the lack

of a requirement or lack of a practice of examining chronically ill

inmates immediately prior to their transport to another facility."

Opp'n, 6.

Decedent was transported on May 11, 2006. The record contains

no evidence that decedent suffered "acute respiratory distress"

until May 12, 2006, after decedent arrived at HDSP. Thus,

plaintiffs may not base a claim on distress arising during

perform x-rays or testing. I was told that
when I went to the jail to deliver such an
order for James Matthews.

The declaration is next to incoherent. It is impossible to know the
referent to the word "that." It may be "that" refers to "jail's
policy."

17

transport.    The   court   turns   to   plaintiffs'   argument   that
mistreatment prior to transport precipitated decedent's demise.

Plaintiffs argue that there were two problems with the care
decedent received prior to transport.    First, plaintiffs have
offered some evidence indicating that decedent did not receive his
prednisone for two days prior to transport, and that failure to
receive  this  medication  either  caused  decedent's  subsequent
respiratory problems or diminished his ability to endure them.
Pardi Decl. ¶ 29.   Nonetheless, as discussed above, no evidence
indicates that the failure to provide the steroid was the result
of a policy, practice or custom.    Thus, plaintiffs cannot base a
Monell claim on deprivation of prednisone for two days prior to
transport.

Plaintiffs also argue that failure to examine the decedent
prior to transport constituted an excessive risk to inmate health,
because   (1)   transport   involves   stresses   that   increase   the
likelihood  of  a  serious  asthma  attack,  (2)  deprivation  of  the
steroids made decedent more susceptible to those stresses, (3) a
pre-transport examination would have identified whether decedent's
condition had deteriorated, and (4) jail officials could then have
responded by delaying transport until they had improved decedent's
condition.    The Pardi declaration provides evidence raising a
triable issue as to each of these steps: (1) in ¶ 28, (2) in ¶ 29,
and (3) in ¶¶ 20, 27.   See also Opp'n 6:22-7:5.

Plaintiffs' claims nonetheless fail, because plaintiffs have
not provided any evidence that could support a finding that the

18

County was deliberately indifferent to this risk to decedent's health, under either the _Farmer_ or _Canton_ standards. In _Gibson_, the Ninth Circuit identified a variety of evidence that indicated the defendant County's deliberate indifference, under _Farmer_, to the detainee's need for a mental health evaluation. 290 F.3d at 1190-92. The defendant County had a policy requiring medical screening on intake, including a mental health evaluation. 290 F.3d at 1183. However, the policy affirmatively called for the screening to be delayed if detainees were combative or uncooperative. _Id._ The court held that a jury could conclude that this policy of delaying evaluation posed a substantial risk of serious harm. _Id._ at 1190. A variety of evidence indicated that the County knew of this risk. The County policy of requiring mental health evaluations demonstrated awareness of these evaluations' importance. _Id._ Other County policies provided for immediate and emergency management of mental illness, further indicating recognition of the urgency of such evaluations. _Id._ at 1190-91. Finally, the County had previously maintained a full-time mental health professional on site, but at the time of the incident, this position was unfilled for personnel reasons. _Id._ at 1191. Plaintiffs in this case have not provided any analogous evidence of the County's (or CFMG's) actual knowledge of the above risk. For example, here is no evidence of either policies specifically that address the needs of inmates with respiratory illness or of the medical needs of inmates during transport. Therefore, plaintiffs have not shown deliberate indifference to

1  this risk under <u>Farmer</u>.

2      Nor have plaintiffs provided evidence satisfying the <u>Canton</u>
3  deliberate indifference standard.  In <u>Canton</u>, the Supreme Court
4  held that because police officers will often arrest fleeing felons
5  and are authorized to use deadly force, it is obvious that, absent
6  training, there is a risk that officers will use excessive force.
7  <u>Canton</u>, 489 U.S. at 390 n.10.  The connection between transporting
8  an inmate and the type of health risk at issue here is not as
9  obvious as the connection between authorization to use deadly force
10 and the risk of excessive use of force.    Furthermore, when the
11 Ninth Circuit has found risks to be "obvious," this conclusion has
12 rested on the municipal entity's knowledge of other facts which
13 relate to the risk.  <u>Gibson</u>, 290 F.3d at 1196 ("[W]hen policymakers
14 know that their medical staff will encounter those with urgent
15 health needs yet fail to provide for the identification of those
16 needs, it is obvious that a constitutional violation could well
17 result."), <u>Oviatt</u>, 954 F.2d at 1478 (risk that detainees would be
18 incarcerated without prompt pretrial procedures obvious where
19 policymaker knew of at least 19 incidents where inmates had
20 remained in jail because they had missed arraignments and knew that
21 some inmates could not communicate their plight to families or
22 lawyers, and where the jail had no procedures to alleviate this
23 problem).  Guided by these examples, the court concludes that
24 plaintiffs have not presented evidence indicating that the risk
25 that decedent's condition would deteriorate as a result of
26 transport was obvious.  <u>See also</u> <u>Bryan County</u>, 520 U.S. at 413

1 (holding that as a matter of law, plaintiff had not provided

2 evidence that could support a finding of deliberate indifference).[7]

3 **iii. Prednisone Dosage**

4 Plaintiffs further argue that decedent was prescribed

5 insufficient amounts of prednisone, in that his doses were too low

6 and in that CFMG attempted to "wean" him off of the steroid

7 entirely.[8]

8 Mere difference of medical opinion does not constitute an

9 Eighth Amendment violation. Jackson v. McIntosh, 90 F.3d 330, 332

10 (9th Cir. 1996). Instead, a plaintiff must "show that the course

11 of treatment the doctors chose was medically unacceptable under the

12 circumstances," and that "they chose this course in conscious

13 disregard of an excessive risk to plaintiff's health." Id. (citing

14 Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 1978-79 (1994)

15 Williams v. Vincent, 508 F.2d 541, 543-44 (2d Cir. 1974)).

16 Plaintiffs have not provided any evidence indicating that the

17 particular doses of prednisone prescribed for decedent (including

18 the decision to wean decedent off of the drug) were medically

19 unacceptable.[9] Thus, the dosage itself cannot be the basis of a

20

21 [7] Because the court grants summary judgment on this ground,
it does not address whether plaintiffs have shown the other

22 elements necessary for any type of Monell liability on this theory
of the case.

23 [8] At one point, plaintiffs' opposition memorandum argues that
defendants stopped decedent's prednisone "cold turkey," but the

24 record indicates that decedent's prescription was tapered, and
plaintiffs acknowledge this taper elsewhere.

25

26 [9] The court notes that the initial report of Stephan Pardi
discusses the risks associated with prednisone, and reasons why a

21

constitutional violation.

Plaintiffs might also challenge the practice by which the dosage was determined. Although plaintiffs' expert does not clearly address this point, his declaration implies that it may be "medically unacceptable" to taper the dose of steroids received by a patient with decedent's diagnosis without carefully and regularly monitoring the patient's respiratory health. Plaintiffs state that the jail records do not indicate that such monitoring was performed. However, even under this theory, plaintiffs have provided no evidence indicating that the decision of whether and how to monitor the patient was the result of a general policy or practice, rather than the decision of the particular treating physician. As such, the record does not support a <u>Monell</u> claim based on this theory.

### iv.   Access to A Private Physician

Finally, plaintiffs argue that a constitutional violation occurred when decedent was prevented from receiving medical care from his own private doctor. Plaintiffs cite to no authority holding that the Eighth Amendment provides an intrinsic right for prisoners to see their own doctors. Plaintiffs have submitted no evidence indicating the County and CFMG disregarded an excessive risk by limiting plaintiff to the medical care provided by CFMG. Indeed, it is unclear how plaintiffs could raise a question on this issue without first presenting evidence indicating that the care

physician might seek to limit the dosage.

provided by CFMG was itself inadequate. If the County prevented decedent from accessing a private physician, this may have violated the state law and the County's own policy,[10] but it did not violate the Eighth Amendment.

### v.    Policy of Contracting Care to CFMG

Finally, plaintiffs argue that the County's decision to contract with CFMG for health services was itself a violation of the Eighth Amendment. Plaintiffs have not provided evidence indicating that this contract itself creates an excessive risk to health and safety, nor have plaintiffs provided any evidence indicating that any County decisionmaker had subjective knowledge of such a risk. Accordingly, this argument fails.

### 4.    Summary of Monell Claims

Although plaintiffs allege that a wide range of conduct deprived decedent of his constitutional rights, they have not provided admissible evidence that would enable a trier of fact to hold the County responsible for any of these alleged deprivations. The County is therefore entitled to summary judgment on plaintiffs' section 1983 claim.

### B.    State Law Claims

Plaintiffs also bring state common law claims against the County of Butte, for wrongful death, fraud, "deliberate indifference," breach of contract, and infliction of emotional distress. These claims do not challenge any additional conduct by

---

[10] See Cal. Pen. Code § 4023, Decl. of Bryan Flicker, Ex. B, 2 (Butte County Sheriff's Office Department Order 5037 § IV).

the County--they merely represent alternate theories of liability for the conduct discussed above. Moreover, plaintiffs' state law claims are barred by the California Government Claims Act.

For any state law cause of action seeking money or damages against a California state or local government entity, the plaintiff must demonstrate compliance with the California Government Claims Act, Cal. Gov. Code section 900 et seq. Pursuant to this act, presentation of a timely claim to the appropriate entity--here, the County of Butte--is a condition precedent to the commencement of a lawsuit for damages against local government entities. Cal. Gov. Code §§ 905, 945.4; see also City of Stockton v. Superior Court, 42 Cal.4th 730, 734 (2007), City of San Jose v. Superior Court, 12 Cal.3d 447, 454 (1974).

To be timely, a claim "relating to a cause of action for death or for injury to person" must be presented "not later than six months after the accrual of the cause of action." Cal. Gov. Code § 911.2(a). Alternatively, within one year of the accrual of the cause of action, a claimant may apply in writing for permission to file a late claim, and if permission is granted, the claim will be considered timely. Cal. Gov. Code § 911.4. If a claimant requests permission within this one year period but permission is denied, a claimant may petition the proper court for permission to proceed further, i.e., for relief from section 945.4. Cal. Gov. Code § 946.6. If, on the other hand, a claimant neither filed a timely claim nor an application to file a late claim within a year of the cause of action, no further relief is available.

24

Plaintiffs filed a government claim with the County on November 21, 2006. Butte County rejected this claim as untimely. Plaintiffs then requested leave to file a late claim, and Butte County denied this request. (Def.'s RJN Supp. Mot. Summ. J. Ex. H.) Plaintiffs did not then seek permission to file a late claim in state court.

Failure to comply with the Government Claims Act creates a jurisdictional bar to suit. However, plaintiffs do not seek an exemption from the Act's requirements, nor do they seek permission from this court to file a late claim. Instead, they argue that their original claim was timely filed, and that the County erred in rejecting it as untimely. Specifically, plaintiffs argue that the cause of action did not accrue until plaintiffs learned more about the circumstances of decedent's death, and that equitable tolling should have extended the sixth month period.

It appears that this court has jurisdiction to consider this argument. The Government Claims Act requires that a claim be filed within six months of accrual, and does not specifically require that the government body have adjudged the claim to be timely. Nor are plaintiffs precluded from raising this argument. The process leading to the County's conclusion that the claim accrued prior to May 21, 2006 did not present "a full and fair opportunity to litigate that issue," and therefore does not give rise to a preclusive effect. <u>Allen v. McCurry</u>, 449 U.S. 90, 95 (1980) (quoting <u>Montana v. United States</u>, 440 U.S. 147, 153 (1979)).

However, plaintiffs' argument fails on the merits. They have

failed to show that their claims against the County did not accrue prior to May 21, 2006, or that the sixth month period should have been tolled.

**1.  Date of Accrual for Plaintiffs' Claims**

For purposes of determining whether a claim is timely, the claim accrues on the date a cause of action would accrue under the statute of limitations applicable if the action was against a private defendant.  Cal. Gov. Code § 901.

Ordinarily, a cause of action accrues "when the wrongful act is done and the obligation or the liability arises," i.e., once the plaintiff "is entitled to begin and prosecute an action thereon." United States Liab. Ins. Co. v. Haidinger-Hayes, Inc., 1 Cal.3d 586, 596 (1970) (citing (1 Witkin Cal.Procedure (1954) p. 614 et seq.).  Applied to this case, the ordinary rule would establish that the cause of action accrued at the latest on the day decedent died, May 16, 2006.  See Norgart v. Upjohn Co., 21 Cal.4th 383, 404 (1999) (wrongful death action accrues on the date of death).

The "delayed discovery rule" provides an exception to this ordinary rule.  Under delayed discovery, a cause of action accrues "when the plaintiff has some reason to suspect an injury and some wrongful cause, unless the plaintiff pleads and proves that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action." Fox v. Ethicon Endo-Surgery, Inc., 35 Cal.4th 797, 807 (2005), see also Jolly v. Eli Lilly & Co., 44 Cal.3d 1103, 1110 (1988).

Here, it is clear that at the time of death, plaintiffs had

reason to suspect both injury and a wrongful cause.  The injury was obvious, and plaintiffs had been complaining of the County's allegedly wrongful treatment of decedent for months prior to the transfer.

Plaintiffs therefore bear the burden of showing that a reasonable investigation would not have revealed the basis of their claims against the County.  To satisfy this burden, plaintiffs must "show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." Fox, 35 Cal.4th at 808 (quoting McKelvey v. Boeing North American, Inc., 74 Cal.App.4th 151, 160 (1999)), E-Fab, Inc. v. Accountants, Inc. Services, 153 Cal.App.4th 1308, 1324 (2007).  Plaintiffs have not satisfied either component of this burden.  In fact, plaintiffs have stated that they were already aware of the basis of most of their claims against the County prior to the transfer (e.g., alleged withholding of medication, low dosage of prednisone, denial of access to a private health care provider).  The only information plaintiffs were not aware of was the County's allegedly improper preparation of decedent for transfer.  As to this theory, a delay in discovering evidence that plaintiffs use to prove this basis for their claim is not sufficient.  Plaintiffs would need to have shown that they had no reason to suspect that the treatment of decedent prior to transport was wrongful.  Plaintiffs have not met their burden of showing that reasonable diligence would not have disclosed the basis for this claim prior to May 21, 2006.

////

1    **2.   Tolling**

2        Plaintiffs also argue that once the cause of action accrued,

3    the six month period was tolled.  Plaintiffs only justification for

4    tolling is the emotional distress Ms. Hagan allegedly suffered

5    after decedent's death.  This is not a sufficient ground for

6    tolling.

7        In light of the above, plaintiffs' state law causes of action

8    accrued on or before May 16, 2006.  Plaintiffs did not file a

9    timely government claim with the County, and did not seek

10   permission from the appropriate state court to file a late claim.

11   As a result, plaintiffs' claims against the County are barred by

12   the California Government Claims Act.

13                              **IV. CONCLUSION**

14       For the reasons stated above, defendant County of Butte's

15   motion for summary judgment is GRANTED.  The clerk of the court is

16   directed to DISMISS County of Butte from this case.

17       IT IS SO ORDERED.

18       DATED:  March 5, 2009.

19

20

21                              LAWRENCE K. KARLTON
                                SENIOR JUDGE
22                              UNITED STATES DISTRICT COURT

23

24

25

26